**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-488 (CRC)** |
| **NOAH BACON,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Noah Bacon to 37 months' incarceration, 36 months' supervised release, $2,000 restitution, and the mandatory special assessments ($100 for Count Six, $25 each for Counts One and Two, and $10 each for Counts Three through Five). The government's calculated guideline range is 30 to 37 months' incarceration, and the 37-month recommendation is at the top end of that range.

**I.      INTRODUCTION**

The defendant, Noah Bacon, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in

1

losses.[1]

Bacon, a 30-year-old certified yoga instructor and landscaper, stormed the United States Capitol building on January 6, wearing a white "I <heart> Trump" T-shirt and a black Space Force baseball hat. In the days and weeks leading up to January 6, Bacon privately expressed his frustration about the 2020 Presidential Election in text messages with his friend, D.K.K. Bacon's text messages reveal that he actively followed the various efforts by former Trump attorney Sidney Powell and certain members of the former administration to subvert or call into question the outcome of the 2020 election.

The government recommends that the Court sentence Bacon to 37 months' incarceration for his violations of 18 U.S.C. § 1512(c)(2) and 2, 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(B), (D), and (G), which is at the top end of the advisory Guidelines' range of 30 to 37 months. A 37-month sentence reflects the gravity of Bacon's conduct, his lack of remorse, and his patently false testimony at trial.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the Complaint and attached Affidavit filed in this case, ECF No. 1 at ¶¶ 2-7, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3,

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

2020 presidential election.

**B.      Bacon's Role in the January 6, 2021 Attack on the Capitol**

Bacon participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos including open-source video, and surveillance footage from inside of the Capitol, as well as his private text messages to his friend D.K.K., in the days and weeks leading up to and immediately following January 6.

*Bacon's Text Messages Leading Up to January 6*

Bacon questioned the results of the 2020 Presidential Election, and clearly believed the election had been stolen from then-President Donald Trump. Bacon hoped that the Supreme Court would overturn the election, and when this failed to materialize, like many others, he set his sights on the Electoral College certification on January 6 at the U.S. Capitol.

On November 26, 2020, during the Trump campaign's efforts to discredit the results of the election in the State of Nevada, D.K.K. texted Bacon, "Another Kracken[2] [sic] released in the state of Nevada via a court date on dec 3rd. Powell is working very hard to expose the fraudulent election i [sic] several states." Bacon replied, "Ive [sic] been glued to the computer watching the news! She is so awesome, a hero."[3] *See* Ex. 400.

---

[2] The Kraken is a gigantic sea monster from Scandinavian folklore that rises from the ocean to devour its enemies. For further context, s*ee* https://www.bbc.com/news/election-us-2020-55090145 ("Lawyer Sidney Powell - who was until recently part of Donald Trump's legal team and is now acting independently - has described the case she was mounting as a 'Kraken' that, when released, would destroy the case for Democrat Joe Biden having won the US presidency.").
[3] During the trial, Agent Michael Connelly explained, "I believe this is a reference to Sidney Powell, who was Former President Donald Trump's personal attorney who filed multiple legal challenges claiming irregularities in the certification of certain states' electoral vote counting." Tr. 2/28/23 at 373:12-15.

Later, on December 12, 2020, in another text exchange, D.K.K. complained about the Supreme Court's refusal to intervene on behalf of the former President and legitimize the false claims of election fraud. Bacon responded, speculating that the former president and his team likely had a back-up plan to challenge the election results. *See* Image 1.



*Image 1 (Ex. 406): Text exchange with D.K.K.; Bacon indicated by the green boxes*

On the day of the attack on the U.S. Capitol, Bacon texted D.K.K., "Trump is speaking and said we are going to march to the Capitol building to be present for pence [sic], whatever he chooses," demonstrating his awareness of the certification proceedings, the Vice President's vital role, and the mob's purpose to prevent or delay the proceedings. *See* Image 2.



*Image 2 (Ex. 401): Text exchange with D.K.K.*

***Approach to the Capitol***

Bacon traveled to Washington, D.C. from his home in Somerville, Massachusetts, via Florida, after a frustrated attempt to organize a meditation retreat. Tr. 3/1/2023 at 553: 13-25, 554: 1-20. On January 6, he first went to the "Stop the Steal" rally in Washington, D.C., where he took a photograph of the crowd which he posted to Instagram. *Id*. at 555: 1-12; *see also* Image 3.[4]

---

[4] Throughout this sentencing memo, the photographs that were admitted into evidence will be identified by their exhibit numbers. If depicted and not prominently displayed, Bacon will be indicated by a yellow circle or box.



***Image 3 (Ex. 407): Bacon's photo of the crowd at the "Stop the Steal" rally***

At the conclusion of the former President's speech, Bacon answered the call to "Go down to the Capitol [and] make your voices heard peacefully and patriotically." Tr. 3/1/23 at 555: 3-12. He joined others walking east toward the Capitol. *Id*. After climbing the steps on the west side of the Capitol, he stopped briefly at the Upper West Terrace to take a west facing photograph before following the other rioters toward the Senate Wing doors.[5] Tr. 3/1/23 at 561-562; *see also* Images 4 and 5.

---

[5] At some point, while at the West Lawn or Lower West Terrace, Bacon testified that "explosions started going off," referencing the law enforcement deployment of flash bangs; he stated, "it was just very disorienting … four or five explosions went off … [a]nd at that moment my state of mind shifted, and I was just very curious and wanted to see what was happening." Tr. 3/1/23 at 555:19-25, 556: 1-7; *see also id*. at 561: 3-10.



*Image 4 (Ex. 104B): Bacon ascending the staircase to the Upper West Terrace*



*Image 5 (Ex. 105A): Bacon taking a picture before entering the U.S. Capitol*

Bacon eventually entered the U.S. Capitol via the Senate Wing Doors at approximately

2:15 p.m. on January 6, approximately two minutes after the initial breach.  *See* Image 6.



***Image 6 (Ex. 106D): Bacon upon entering U.S. Capitol through Senate Wing doors***

After entering via the Senate Wing doors, Bacon moved south with the flow of rioters toward the Crypt where they encountered an *ad hoc* defensive line of Capitol police officers, which included Officer Juan Lopez, a member of the Civil Disturbance Unit, returning to duty from the decontamination station after exposure to bear spray on the West Front. *See* Tr. 2/28/23 at 395-401; *see also* Tr. 3/1/23 at 565-566. The officers formed up to prevent the crowd from accessing the House wing. *Id*. Bacon stood at the front line of rioters massing against the Capitol police defensive line and he pressed forward with the crowd surge that enveloped and overwhelmed the thin line of defenders. *See* Image 7*; see also* Exs. 130 ("The Resistance" video) and 131 ("Inside Capitol" video).



*Image 7 (Ex. 130A): Bacon as part of mob overwhelming police officers in the Crypt*

At approximately 2:29 p.m., Bacon was behind the first wave of rioters moving into the House Wing, following the Capitol police officers who were retreating, consolidating, and regrouping in the Hall of Columns. *See* Images 8 and 9; *see also* Exs. 108 and 109 (USCP CCTV).



*Image 8 (Ex. 108B): Bacon celebrating with other rioters in the House Wing*



*Image 9 (Ex. 130C): Bacon in House Wing moving toward the Hall of Columns*

After encountering the Capitol police regrouping in the Hall of Columns, Bacon and the crowd double-backed, returning north toward the Crypt. Bacon followed, moving with the mob

through the Memorial doors, and up a flight of steps as rioters loudly chanted, "Nancy, Nancy, Nancy," emerging on the second floor near the House Speaker's offices between the Statuary Hall and the Rotunda. *See* Image 10; *see also* Ex. 131.



***Image 10 (Ex. 131B): Bacon moved with the mob to the second floor of the U.S. Capitol***

At approximately 2:34 p.m., Bacon entered the Rotunda, arms outstretched at his sides in an apparent gesture of celebration. *See* Image 11.



***Image 11 (Ex. 111A): Bacon upon entering the Rotunda***

Bacon spent approximately three minutes in the Rotunda celebrating with other rioters and clasping his hands in a gesture of prayer before moving into the Rotunda interior at approximately 2:37 p.m. As Bacon arrived in the Rotunda interior, rioters massed outside the east front Rotunda doors were aided by rioters inside, who pushed aside a small number of Capitol police officers to reestablish the breach. Bacon maneuvered through the crowd, rushing to the door, working with others to push the Rotunda door open. Tr. 2/28/23 at 378:25 – 379:1-15; s*ee also* Ex. 115 and Image 12. As the breach was successfully reestablished, Bacon grabbed a discarded flag, which he held above his head as new waves of rioters flooded into the Capitol, in an apparent effort to obscure one of the CCTV video cameras. *Id.*; *see also* Image 13. Though his intention was obvious from the video, in his trial testimony, Bacon incredibly claimed that his intent was to prevent further damage to the door, and once opened, he was attempting to use the flag to prop the door. *See* Tr. 3/1/23 at 557: 10-19, 569:12-25, 570:1-19.



***Image 12 (Ex. 115A): Bacon worked to push the Rotunda door open, re-establishing
the East Front breach***



***Image 13 (Ex. 115B): Bacon attempted to use a flag to block a video camera***

At approximately 2:40 p.m., Bacon followed other rioters as they continued to freely move

throughout the Capitol, bounding up the Gallery Stairs to the third floor; he walked north through the east corridor toward the Senate Gallery. *See* Exs. 116 and 117. He was among the initial wave of rioters arriving at the Senate Gallery, minutes after the Senate had been safely evacuated, as plainclothes Capitol police officers, Matthew Alpert, Governor Latson, and Sergeant Nairobi Timberlake were attempting to secure the gallery doors that provided access to the balcony overlooking the Senate Chamber. *See* Exs. 118 and 134; *see also* Tr. 3/1/23 at 464-467. Bacon was seated on a bench, watching as rioters violently confronted the trio of plainclothes officers and prevented them from securing the gallery doors that access the Senate Chamber balcony, though Bacon incredibly at trial claimed, "If I saw it. I don't remember." Tr. 3/1/23 at 572:8, 570:20-25, 571-572; *see also* Images 14 and 15.



***Image 14 (Ex. 118A): Bacon watched as police officers tried to quickly secure the Senate Gallery doors***



***Image 15 (Ex. 134B): Bacon watched from a bench as rioters physically confronted
officers and forced their entry into the Senate Chamber balcony***

After Sergeant Timberlake and his fellow officers were forced to fall back, Bacon and the
others entered the Senate Chamber balcony. *See* Ex. 129 ("New Yorker" video). As Bacon entered,
he reached up to unlatch the cam bolt on the second door, facilitating entry for others lined up to
enter. *See* Ex. 129; *see also* Tr. 2/28/23 at 336: 5-10, 380:15-25, and 381:1-6. In the background,
various rioters could be heard shouting, "Is this the Senate", "where the fuck are they", "where are
they", "while we're here, we might as well set up a government", "where the fuck is Nancy". *Id.*
Even though the rioters seemed to collectively recognize that they were entering a Chamber of
Congress, Bacon once again at trial incredibly claimed to not know where he was. Tr. 3/1/23 at
558: 1-11.

Bacon and the other rioters then maneuvered down to the second floor, gaining access to
the Senate Chamber. *See* Exs. 119-121. Bacon entered at approximately 2:49 p.m., found a seat in

the back of the chamber where he remained for approximately 10 minutes, as rioters freely roamed the chamber rummaging through desks and paperwork; he exited the chamber around 2:59 p.m. *See* Image 16; *see also* Exs. 123 and 124 (C-SPAN video) and 123B. Unbelievably, at trial Bacon claimed to be in a type of fugue state brought on by the early exposure to flash bang grenades before he entered the U.S. Capitol. Bacon claimed he remained in this state from the moment the flash bang grenades went off until he had the opportunity to meditate and reflect at the back of the Senate Chamber. *See* Tr. 3/1/23 at 563: 10-25, 564: 1-2.[6]



***Image 16 (Ex. 123A): Bacon seated in the Senate Chamber while other rioters ransacked desks***

---

[6] Interestingly, when pressed on cross-examination, after this period of meditative self-reflection, Bacon still avoided admitting that he recognized what they were doing was wrong, and instead only conceded that his "state of mind changed." In other words, he was finally roused from his self-described unconscious, fugue state and decided it was time to leave. *Id.*

After leaving the Senate Chamber, Bacon made his way down to the first floor, exiting via the North Door Appointment desk at approximately 3:06 p.m. *See* Image 17; *see also* Ex. 126.



*Image 17 (Ex 126A): Bacon exiting the U.S. Capitol*

### POST-JANUARY 6 STATEMENTS

On January 7, 2021, in a text message exchange with D.K.K., Bacon expressed his hope that the military would intervene to undue the election results. Bacon predicted that either Vice President Pence would "be taken out when military arrests are made," or that Pence was maneuvering behind the scenes to encourage military mobilization. Bacon also grossly minimized the violence and destruction that he had witnessed first-hand the day prior. He attempted to deflect blame, suggesting that the destruction was caused by "a tiny handful of agitators" and Antifa, and generally celebrated the failed insurrection; "everything is moving perfectly," he said. *See* Images 18 and 19.



*Image 18 (Ex. 404): Bacon text message to D.K.K. on January 7, 2021*



*Image 19 (Ex. 405): Bacon text message to D.K.K. on January 7, 2021*

**BACON'S TESTIMONY AT TRIAL**

Bacon testified in his defense at trial. His testimony was not only not credible, but it was also demonstrably false in many respects. Tr. 3/1/2023 at 552-582. He offered absurd explanations and denials in a bald-faced attempt to defeat the essential element of *mens rea*. As discussed in greater detail throughout this memorandum, Bacon suggested that he was deeply affected by the early exposure to flash bang deployment while on the West Front prior to his entry into the U.S. Capitol. Tr. 3/1/23 at 555:19-25, 556: 1-7, 561: 3-10. He suggested that his actions were unconscious (or less conscious) from that point forward. He was equivocal when questioned about joining other rioters in chanting while inside the Crypt, though video showed his head moving up and down while fellow rioters could be heard chanting "Trump, Trump, Trump". Tr. 3/1/23 at 551: 4-7, 564:22-25, 565:1-20, *see also* Exs. 130 and 131.

While inside the Rotunda interior, as rioters were breaching the East Front Rotunda doors from outside and within the Capitol, he claimed to only be trying to prevent further damage to door when he rushed to help others push the door open, allowing the free flow of new waves of rioters into the Capitol. Tr. 2/28/23 at 378:25 – 379:1-15; *see also* Ex. 115 and Image 12. Rather than simply acknowledging that he held a flag up to obscure one of the CCTV cameras, he claimed that this was part of his continuing effort to prevent further damage to the door. Tr. 3/1/23 at 557:10-15 ("That is me in the video, but I was not intending to cover the camera. It might sound very dumb, but I saw the door opening and people coming through. I had seen windows and doors broken. And so in that kind of chaotic state of mind, I thought of taking the flag that you see and using it like a door stopper.")

While sitting on a bench in the Senate Gallery, he claimed to not remember seeing other rioters engaging with Sergeant Timberlake and two other plainclothes Capitol police officers, though he had a front row seat and an unobstructed view to the violence unfolding in front of him. Tr. 3/1/23 at 572:8, 570:20-25, 571-572; *see also* Images 14 and 15. As the rioters entered the balcony of the Senate Chamber, audibly asking "Is this the Senate", "where the fuck are they", "where are they", "where the fuck is Nancy," Bacon denied recognizing that he was in the Senate Chamber, though he could clearly hear the queries around him. *See* Ex. 129; *see also* Tr. 2/28/23 at 336: 5-10, 380:15-25, and 381:1-6.

Taken alone, one absurd explanation or denial could be considered inconsequentially misleading, but when considered as a whole, Bacon's testimony was in many respects, patently false.

## THE CHARGES AND TRIAL

On July 23, 2023, a federal grand jury returned an indictment charging Bacon with six counts, including, Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Six), Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count One), Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Two), Entering and Remaining in the Gallery of either House of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B) (Count Three), Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four), and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five). On March 2, 2023, Bacon was convicted of those offenses following

a jury trial.

### III.     STATUTORY PENALTIES

Bacon now faces sentencing on Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Six), Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count One), Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Two), Entering and Remaining in the Gallery of either House of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B) (Count Three), Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four), and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five).

As noted by the Presentence Report issued by the U.S. Probation Office, Bacon faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100 for Count Six; up to one year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25 for each of Counts One and Two; and up to six months of imprisonment, a fine up to $5,000, and a mandatory special assessment of $10 for each of Counts Three through Five.

### IV.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Government largely agrees with the Sentencing Guidelines calculation set forth in the Pre-Sentence Report (PSR). PSR ¶ 85.  First, the PSR fails to include a two-level enhancement for obstructing or impeding the administration of justice in recognition of Bacon's demonstrably false trial testimony. U.S.S.G. § 3C1.1.  Second, the PSR mistakenly fails to include a full Guidelines analysis for all three Counts to which the Guidelines apply—Counts Six, One, and Two.[7] *See* PSR ¶¶ 36-45. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments.  Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSR does not follow these steps. It concludes (*see* PSR ¶ 34) that Counts Six, One, and Two group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). That Guidelines analysis is as follows:

Count Six: 18 U.S.C. § 1512(c)(2) and (2)[8]

U.S.S.G. § 2J1.2(a)          Base Offense Level          14

---

[7] As the PSR properly notes, pursuant to U.S.S.G. § 1B1.9, the Guidelines do not apply to counts of conviction that are Class B misdemeanors, and so do not apply to Counts Three, Four, or Five here. PSR ¶ 32.

[8] For the aiding and abetting charge (18 U.S.C. § 2), the offense level would be the same as that for the underlying offense. *See* U.S.S.G. § 2X2.1(a).  Accordingly, that analysis mirrors the analysis for 18 U.S.C. § 1512(c)(2) here.

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[9] | +3 |
| U.S.S.G. § 3C1.1 | Obstructing the Administration of Justice | +2 |
| | **Total** | **19** |

Count One: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3 (a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A) | Trespass occurred at any restricted building or grounds[10] | +2 |
| *Cross Reference* | | |
| U.S.S.G. § 2B2.3(c)(1)/2X1.1 | Intent to Commit a Felony[11] | 17 |
| U.S.S.G. § 3C1.1 | Obstructing the Administration of Justice | +2 |
| | **Total** | **19** |

Count Two: 18 U.S.C. § 1752(a)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 3C1.1 | Obstructing the Administration of Justice | +2 |
| | **Total** | **12** |

| | |
|---|---|
| **Combined Offense Level** | **19** |
| Acceptance of responsibility (U.S.S.G. § 3E1.1)[12] | <u>0</u> |

---

[9] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Bacon was found guilty of corruptly obstructing and impeding an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

[10] Section 2B2.3 gives "restricted building or grounds" the meaning that the phrase is given in 18 U.S.C. § 1752. U.S.S.G. §2B2.3 cmt. n.1.

[11] Since the Section 1752(a)(1) offense was committed with an intent to commit another felony (18 US.C. § 1512), the base offense level of that felony applies to the 1752(a)(1) charge, pursuant to U.S.S.G. § 2B2.3(c)(1) and § 2X1.

[12] Bacon contested essential factual elements of guilt at trial, such as denying that he went to the

**Total Offense Level:**                                                              **19**

Counts Six, One, and Two group because all involve the same victim: Congress. U.S.S.G. § 3D1.2(a) and (b). The offense level for that Group is the level "for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." U.S.S.G. § 3D1.3(a). Bacon testified in his defense at trial, and because he offered patently false testimony, the combined offense level increases two levels, resulting in adjusted offense level of 19. U.S.S.G § 3C1.1. Since Counts Six and One have the highest offense levels for any count in the group (both are 19), the combined offense level for the group is 19. And because acceptance of responsibility points are not available in the instant case, the total offense level remains 19. The government disagrees with the Probation Officer's estimated total offense level of 17.  PSR ¶ 45.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 48. Accordingly, based on the government's calculation of the defendant's total adjusted offense level of 19, Bacon's Guidelines imprisonment range is 30 to 37 months' imprisonment.

## V.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

---

Capitol to stop the certification; denying that he consciously entered the Capitol, or that his intent was to disrupt the certification proceedings. Accordingly, the adjustments for acceptance of responsibility in U.S.S.G. §§ 3E1.1(a) and (b) should not apply.  U.S.S.G. §§ 3E1.1 Application Note 2; U.S.S.G. § 3E1.1(b).

**A.      Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, Bacon's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Bacon's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 37 months' incarceration, 36 months' supervised release, and $2,000 restitution.

**B.   The History and Characteristics of the Defendant**

Bacon is a 30-year-old certified yoga instructor and landscaper. PSR ¶¶ 54, 71-73. His rhetoric leading up to January 6, in a series of private text communications with his friend, D.K.K., clearly reveal Bacon's belief that the election was stolen. Those communications further demonstrate that he was dialed in to the various lines of effort to subvert the results of the election; he was aware that one prong of those efforts relied on the mob's actions to prevent or delay the certification proceedings.

Bacon's history and characteristics, his demonstrably false statements at trial, and his lack of remorse, weigh in favor of a lengthy term of incarceration.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Bacon's criminal conduct, on January 6 was extreme and dangerous. Bacon entered the U.S. Capitol on January 6 to support the mob's efforts to prevent or delay the certification proceedings. He was among the first wave of rioters to enter through the Senate Wing doors, the

initial breach point. He was on the front line of rioters massing against a thin *ad hoc* defensive line of Capitol police trying to keep the mob from accessing the House wing. From within the Capitol, he actively assisted a secondary breach of the Rotunda doors, enabling countless others to access the building. He had a front row seat as rioters violently confronted plainclothes Capitol police officers attempting to secure the Senate gallery. He spent a minimum of 10 minutes seated in the Senate Chamber, reinforcing his fellow rioters as they occupied high value terrain within the Capitol. His behavior helped to delay the certification and interfere with the peaceful transition of power, as was his intent. This was textbook disrespect for the rule of law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[13] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, Bacon has yet to express any remorse for his actions. *See e.g.*, Tr. 3/1/2023 at 552-582; *see also* PSR ¶¶ 53-81. In his testimony, Bacon described his entry into the Capitol as an

---

[13] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

unconscious, spontaneous action brought on by the disorienting event of being exposed to non-lethal riot control munitions. He denied assisting the secondary breach of the east front Rotunda doors, though he could plainly be seen rushing to the front of the crowd and pushing the door open as rioters from the east front flowed into the Capitol. He denied witnessing fellow rioters violently preventing plainclothes officers from securing the Senate Gallery doors after the Senate evacuation, though he was seated mere feet away with an unobstructed line of sight. In a text message to D.K.K. on January 7, he blamed a "tiny handful of agitators [for the suffering that did occur]," and suggested that Antifa was somehow responsible: "I just saw a great social media post where a maga guy tackled the antifa guy for smashing windows." *See* Ex. 405. Bacon made these statements after having walked through broken doors, around broken windows, seeing the Senate Chamber broken into, witnessing rioters chanting "Nancy, Nancy" over and over again, and hearing from law enforcement officers about the horrors of that day. Lastly, despite Bacon's effort to make his trip to D.C. appear spontaneous, brought on by circumstances, his text messages with D.K.K. refute that. He was closely watching the former President's efforts to undermine the 2020 election results and clearly understood the multi-pronged "Kraken" nature of those efforts. He recognized that delaying or preventing the certification was the final nuclear option, and he answered the call to arms and to play his part. Had the Senate Gallery not been emptied minutes before, Bacon could have come face-to-face with the Vice President and the politicians that the rioters were there to strong arm.  Through his testimony and character witnesses Bacon attempted to portray himself as a non-violent person, and though he did not personally engage in acts of violence, he nonetheless stood idly by, at the front lines, while his accomplices committed

countless acts of violence and property destruction in his presence. Accordingly, he did his part to ensure that "everything [continued] moving perfectly" for the purpose of preventing the certification and peaceful transfer of presidential power.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As noted above, the Guidelines call for a lengthy term of incarceration.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the

need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how

other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[14]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Larry Brock (21-CR-140-JDB), a retired lieutenant colonel who had served as a fighter pilot in the United States Air Force, engaged in substantially more violent rhetoric on social media than Bacon prior to the events of January 6. Brock, unlike Bacon, purchased and wore body armor and a helmet, suggesting a greater level of preparation for violence. Aside from those factual dissimilarities, the cases are virtually indistinguishable. Brock approached the Capitol from the West Front, entered via the Senate Wing doors at 2:24 p.m., approximately 9 minutes after Bacon.

---

[14] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Brock's route throughout the Capitol was virtually identical to Bacon's from entry via the Senate Wing doors to the Senate Chamber. The only other distinguishing feature was that Brock, at times, attempted to reign in or calm his fellow rioters, encouraging them to be respectful and refrain from violence or destruction of property, while Bacon largely moved in silence – neither encouraging violence, but doing nothing to stop it. Brock was convicted after a bench trial, was not given credit for acceptance of responsibility, but also did not attempt to mislead the finder of fact with dubious explanations and denials at trial. Judge Bates sentenced Brock to period of 24 months' incarceration.

In *United States v. Christine Priola*, 22-cr-242 (TSC), defendant Priola pleaded guilty to 18 U.S.C. §1512(c)(2) and received a sentence of 15 months of incarceration. Similar to Bacon, defendant Priola entered the sensitive area of the Senate Chamber on January 6. Whereas Priola called an associate and encouraged that person to enter the Capitol building, saying it was "now or never." Bacon helped to open both the Rotunda and Senate chamber doors, easing the entry of other rioters. Neither Bacon nor Priola engaged directly in violence on officers on January 6, but whereas Priola accepted responsibility and expressed remorse for her actions, Bacon has never taken responsibility for his conduct.

Matthew Bledsoe (21-CR-204-BAH) is another January 6 case with similarities to the Bacon case.  Bledsoe, like Bacon, entered through the Senate Wing Doors within 15 minutes of the initial breach of those doors.  Bledsoe also had social media rhetoric before January 6.  Bledsoe paraded through the Capitol with a flag, while Bacon merely displayed his "I <heart> Trump T-shirt.  Bledsoe went near the House Chamber, while Bacon went onto the Senate Gallery, and onto

the Senate Floor.  Bledsoe spent a total of 22 minutes inside the Capitol, while Bacon spent more than 50 minutes inside the Capitol.  Like Bacon, Bledsoe also was convicted after a trial.  The Government asked for 70 months in Bledsoe, and Bledsoe was eventually sentenced to 48 months incarceration.

### G.    Bacon's Objections to the PSR

Bacon had no substantive objections to the PSR but requested minor corrections and/or additional details to Part C, ¶¶ 63, 71, and 74.  The government initially reported having no objections to the PSR (ECF No. 101), but on further review, the government objects to the omission of the two-level enhancement for obstructing or impeding the administration of justice pursuant to U.S.S.G. § 3C1.1.

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the

VWPA. _Papagno_, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. See 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." _Hughey v. United States_, 495 U.S. 411, 418 (1990) (interpreting the VWPA); _see United States v. Clark_, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under Hughey).[15] Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[16] _See_ 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" _United States v. Ekanem_, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. _See Papagno_, 639 F.3d at 1097-97; 18 U.S.C.

---

[15] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  _See_ 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); _see also United States v. Zerba,_ 983 F.3d 983, 986 (8th Cir. 2020); _United States v. Giudice,_ 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[16] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. _See United States v. Emor_, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

§§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[17] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a

---

[17] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513. Here, the Court should find that Bacon's conduct in entering the Capitol building as part of a mob caused damage to that building.

discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." _United States v. Williams_, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" _Fair_, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[18]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter

---

[18] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. See 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

approach is appropriate here.

More specifically, the Court should require Bacon to pay $2,000 in restitution for his convictions on Counts One through Six. This amount fairly reflects Bacon's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 37 months' incarceration, 36 months' supervised release, $2,000 restitution, and the mandatory special assessments ($100 for Count Six, $25 each for Counts One and Two, and $10 each for Counts Three through Five).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:      /s/ Douglas Meisel
          Douglas Meisel
          Trial Attorney
          NY Bar No. 4581393
          601 D. Street, NW
          Washington, D.C. 20530
          202-923-7821
          Douglas.meisel@usdoj.gov